UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 7:14-15-DCR |
| | ) | Civil Action No. 7:16-176-DCR |
| v. | ) | |
| | ) | |
| ERIC WILLIAMS, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On August 9, 2016, Defendant Eric Williams filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  (R. 46).  The United States has filed its Response, to which Williams filed a Reply.  (R. 65; R.69).  Accordingly, the matter is ripe for consideration and preparation of a Report and Recommendation.  For the reasons stated below, it will be **recommended** that Williams's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (R. 46) be **denied**.

I.      **FACTUAL AND PROCEDURAL HISTORY**

Williams's underlying conviction in this matter is based on his admission to the following facts:

(a)      On December 2, 2013, Defendant along with Denardo Sequan Hopkins, Kamau Blakney, and Gregory Kittle were inmates at USP Big Sandy in Martin County, Kentucky.  USP Big Sandy is a maximum security correctional facility owned and operated by the United States Department of Justice, Bureau of Prisons.

(b)      At approximately 3:00 p.m., Kittle walked down the steps from the second floor where his cell was located to the card table area on the first floor where Hopkins was playing cards with other inmates.  Kittle demanded that Hopkins stop playing cards and come to his cell.  Hopkins refused.  Blakney interceded in the dispute between Hopkins and Kittle and all three went up to and entered Kittle's cell

to discuss the dispute.  Defendant followed the three up the stairs, but stood outside Kittle's cell and watched through the cell door.  Blakney left the cell as Kittle began fighting with Hopkins.  Defendant entered the cell to join in the defense of Hopkins, who is considerably smaller in stature than Kittle.  As the fight progressed, Defendant produced a homemade shank and began stabbing Kittle repeatedly.  During the heat of the battle, Defendant stabbed Kittle in the neck with the shank, which ruptured his carotid artery.  Kittle began to weaken as he lost massive amounts of blood from the wound to his neck.  Ultimately, Kittle became unable to continue in the fight and set [sic] down on the steps.  As Defendant and Hopkins walked down the steps, Defendant gave the shank to Hopkins and both enter[ed] their cell where they began washing Kittle's blood from their bodies and attempted to flush the shank down the toilet.  The time was approximately 3:18 p.m.

(c)      Kittle was transported from USP Big Sandy to a local hospital where he died at approximately 4:28 p.m. from the stab wound to his carotid artery.  An autopsy found that his body was covered with multiple stab and puncture wounds and that he had several defensive wounds on his hands.  On the other hand, a medical evaluation after the fight found that Defendant and Hopkins sustained no significant injuries from the fight and had not one stab or puncture wound.

(R. 33, at 2; R. 60, at 31-33).

August 7, 2014, a federal grand jury returned a three-count Indictment against Williams and his co-Defendant Hopkins, charging each of them with murder (18 U.S.C. § 1111(a)), voluntary manslaughter (18 U.S.C. § 1112(a)), and possessing a prohibited object, to wit a weapon, while an inmate in a prison (18 U.S.C. §§ 1791(a)(2), (d)(1)(B)).  (R. 1).  On August 22, 2014, Williams appeared with counsel at his initial appearance and arraignment and pleaded not guilty to all counts. (R. 9).

On March 17, 2015, Williams appeared with counsel for rearraignment and entered a guilty plea to Count 2 of the Indictment, voluntary manslaughter, pursuant to a written Plea Agreement with the United States.  (R. 23; R. 33; R. 60).  In exchange for Williams's plea, the United States agreed to dismiss the remaining counts against him and all counts against his co-Defendant. (R. 33). In addition, the Plea Agreement provided the Government would also recommend a decrease in

Williams's United States Sentencing Guidelines offense level by two points, or three points if appropriate, in recognition of his acceptance of responsibility. (*Id.* at 3, ¶ 5(e)).

At the rearraignment hearing, Williams was placed under oath and the District Court conducted a thorough plea colloquy. (R. 60). Among other things, the District Court questioned Williams to determine whether he was competent and able to enter a guilty plea. After hearing from Williams and confirming that counsel was satisfied Williams was competent, the District Court found Williams was fully competent and capable of entering an informed plea. (*Id.* at 4-13, 34).

The District Court also questioned Williams extensively at the rearraignment to ensure that he understood all of the terms of the Plea Agreement. (*Id.* at 15-34). The Court specifically asked Williams if he had read the Plea Agreement, if defense counsel had gone over the Plea Agreement with him, if he understood the terms of the Plea Agreement, and if he was satisfied with defense counsel's representation; Williams answered in the affirmative to all of these questions. (*Id.* at 13-16). The Court also asked Williams if anyone had made any promises to him that caused him to sign the Plea Agreement or to enter a guilty plea, to which he responded, "No, sir." (*Id.* at 18). Williams also denied that anyone had told him he would receive a specific sentence in exchange for his guilty plea. (*Id.*). Williams further denied that anyone had made any threats or in any way forced him to enter a plea of guilty. (*Id.*).

The Court went over the potential penalties Williams faced by pleading guilty in order to ensure he understood the maximum penalties that could be imposed by law. (*Id.* at 19-20). The Court further explained how the Sentencing Guidelines operate and how they may be applied in Williams's case. (*Id.* at 21-24). The Court informed Williams that, after the plea but before sentencing, a PSR would be prepared by the Probation Office and that he would be able to review

3

it with counsel and file any objections he may have to its contents. (*Id*. at 21). Williams was advised that his objections to the report, if any, would be ruled upon prior to sentencing and that, until the objections were ruled upon, it would be impossible to know the Sentencing Guidelines range applicable to his case. (*Id*. at 21-22). Williams was also advised that while the Plea Agreement sets forth the parties' recommendations about the Sentencing Guidelines, those recommendations are not binding on the Court. (*Id.* at 22). The Court also informed Williams of the rights he was giving up by pleading guilty, and Williams confirmed he understood that he was giving up these rights by pleading guilty. (*Id*. at 28-30).

Turning to the facts of this case, the Court explained to Williams what he was charged with under Count 2 and asked Williams to state in his own words what he did to be guilty of manslaughter as charged. (*Id*. at 31). Williams responded, "I got into a fight with a guy, I had a knife on me, and I killed him." (*Id*.). As explained more fully below, upon the Court's questioning, Williams provided more details regarding the knife and the fight. (*Id*. at 32). Williams also confirmed paragraph 3 of the Plea Agreement contains a true and correct statement of the facts in the case, and he acknowledged that if the case proceeded to trial, the Government could prove the essential elements of Count 2 beyond a reasonable doubt. (*Id.* at 32-34).

After the colloquy, the Court found that the plea was knowing and voluntary, and supported by an independent basis in fact containing the essential elements of the offense charged. (*Id*.). As such, the Court accepted Williams's plea of guilty and adjudged him guilty of voluntary manslaughter as charged in Count 2 of the Indictment. (*Id*.).

Following Williams's rearraignment and prior to his sentencing hearing, the Probation Office prepared the PSR. The PSR contained a summary of the facts of this case and provided the

calculations under the Sentencing Guidelines that placed Williams at a base offense level of 29.[1] (PSR, at ¶¶ 9-14). With the three-level reduction for acceptance of responsibility, the PSR reflected a final base offense level of 26. (*Id*. at ¶¶ 15-16). The PSR also contained an analysis of Williams's background, including his criminal history. (*Id*. at ¶¶ 17-30). Williams's criminal history category was calculated to be a VI. (*Id*. at ¶¶ 27-30). Based on Williams's total offense level of 26 and criminal history category of VI, he had a Sentencing Guidelines range of 120 to 150 months of imprisonment.

Prior to sentencing, Williams's counsel filed a Sentencing Memorandum on his behalf, arguing for a downward departure under § 5K2.10 of the Sentencing Guidelines based on the victim's conduct in this matter. (R. 30). The Government also filed a Sentencing Memorandum, arguing against such a finding. (R. 31).

On April 29, 2015, Williams appeared with counsel for sentencing. (R. 35; R. 64). Counsel argued Williams's position with respect to his request for a downward departure under § 5K2.10. As explained more thoroughly below, the Court sustained the request, finding the circumstances warranted a one-level reduction under § 5K2.10. (R. 35; R. 64, at 14-17). The Court heard from defense counsel and the Assistant United States Attorney ("AUSA") regarding an appropriate sentence. After hearing argument of counsel, the Court considered the sentencing factors contained in 18 U.S.C. § 3553 and explained a sentence at the top of the reduced Sentencing Guidelines range was appropriate under the circumstances. Accordingly, the Court sentenced Williams to 137 months

---

[1] Williams was also noted to be a career offender. This finding did not, however, impact his Sentencing Guidelines calculations as he already had an offense level of 29 and a criminal history score of VI.

of imprisonment, to run consecutive to any undischarged term of imprisonment, followed by a 3-year term of supervised release.[2]  (R. 36).

Williams did not appeal.  On August 9, 2016, Williams filed the pending Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  (R. 46). In his Motion, Williams asserts five grounds for relief.  In order of his presentation of claims, Williams alleges: 1) counsel did not contact witness Blakney, but told Williams he contacted Blakney and Blakney refused to help; 2) he was housed pretrial in a county jail where he did not have access to a law library in violation of his due process rights; 3) despite Williams's request, counsel did not ask for a binding plea agreement under Rule 11(c)(1)(C) capping his sentence at 8 years of imprisonment; 4) counsel did not present evidence to support his argument for a downward departure for the victim's role; and 5) counsel failed to argue Williams's "mental diminished capacity in regards to [his] mental health history."  (*Id.*).

## II.    ANALYSIS

Under 28 U.S.C. § 2255(a), a federal prisoner may seek habeas relief on grounds that his conviction or sentence violated the Constitution or laws of the United States, that the court lacked jurisdiction to impose the sentence, that the sentence exceeded the maximum authorized by law, or that the sentence is otherwise subject to collateral attack.  *See* § 2255(a).  A § 2255 motion does not have to be founded on constitutional error or even federal law.  *Watt v. United States*, 162 F. App'x 486, 502-03 (6th Cir. 2006).  However, to succeed on a § 2255 motion alleging constitutional error, a defendant "must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings."  *Watson v. United States*, 165 F.3d 486, 488 (6th

---

[2]On June 25, 2016, the Judgment was amended to reflect the amount of restitution owed.  (R. 41).

Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).  To obtain relief under § 2255 for a nonconstitutional error, a defendant must establish either a fundamental defect in the criminal proceedings which inherently resulted in a complete miscarriage of justice, or an error so egregious that it amounts to a violation of due process.  *See Riggs v. United States*, 209 F.3d 828, 831 (6th Cir. 2000), *abrogated on other grounds as recognized by Kumar v. United States*, 163 F. App'x 361 (6th Cir. 2006); *see also Hicks v. United States*, 122 F. App'x 253, 256 (6th Cir. 2005); *McNeal v. United States*, 17 F. App'x 258, 260-61 (6th Cir. 2001).  In sum, a defendant must allege in his § 2255 motion that: (1) his conviction was the result of an error of constitutional magnitude; (2) his sentence was imposed outside of statutory limits; or (3) there was an error of law or fact so fundamental as to render the proceedings invalid.  *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (citing *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).  A defendant must prove his allegations by a preponderance of the evidence.  *Pough*, 442 F.3d at 964.

Here, Williams is asserting four grounds of ineffective assistance of counsel.  In addition, Williams is also raising one non-ineffective assistance of counsel claim, arguing a violation of due process.

### A.    Ineffective Assistance of Counsel Claims

Williams asserts various claims that his trial counsel, Andrew M. Stephens, provided ineffective assistance.  Specifically, Williams argues that counsel did not contact Blakney, who witnessed the incident, but told Williams he contacted Blakney and Blakney refused to help.  He also argues that despite his request, counsel did not seek a Rule 11(c)(1)(C) plea agreement capping his sentence at 8 years.  Williams further asserts that counsel failed to present evidence at sentencing

to support the argument that Williams was entitled to a downward departure for the victim's role in the offense, and counsel also failed to argue Williams's "mental diminished capacity."

The Supreme Court has held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To meet this standard, the Court set forth a two-part test. First, a defendant is required to show that counsel's representation fell "below an objective standard of reasonableness." *Id*. at 687-88. In reviewing this prong, the lower court is to apply a deferential standard; there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. If a defendant satisfies the first prong, he must also establish that counsel's deficient performance prejudiced him. *Id*. at 691-94. Specifically, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Thus, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error did not affect the judgment. *Id.* at 691.

In the context of a guilty plea, where a defendant is represented by counsel and enters a guilty plea upon advice of counsel, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). While the deficient performance prong of the *Strickland* test remains the same, to establish prejudice a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *Griffin v. United States*, 330

8

F.3d 733, 737 (6th Cir. 2003) (quoting *Hill*, 474 U.S. at 58-59). Both prongs of the test must be met before a court finds ineffective assistance, but courts are not required to conduct an analysis under both. *Strickland*, 466 U.S. at 697. If the court finds a defendant cannot meet one prong, it need not address the second prong. *Id.*

> **1.   Williams has not demonstrated counsel provided ineffective assistance in not interviewing Blakney.**

Williams claims his trial counsel provided ineffective assistance by failing to interview Kamau Blakney, a fellow inmate who was initially present in Kittle's cell, but who left the cell prior to Williams entering. (R. 46, at 4). Williams contends counsel falsely told him that counsel did contact Blakney, but Blakney refused to help. Williams asserts that counsel's false statement about Blakney refusing to help "altered [his] thinking" in making the decision whether to take the plea deal or to go to trial. (*Id.*).

Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste" or reasonably expected to provide only cumulative information. *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) ("there comes a point at which evidence from [further investigation] can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."); *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste").

In support of Williams's Motion, Blakney filed an Affidavit. (R. 61). In his Affidavit, Blakney stated that he was an eyewitness in the case, was willing to testify for the defense, but was never contacted by defense counsel. (R. 61). While Blakney states he is willing to give his "account on what [he] witnessed," he does not provide what his testimony would have been.

Attorney Stephens explains in his Affidavit that on the date he was at USP Big Sandy interviewing potential witnesses, Blakney had already been transferred to USP Hazelton, located in West Virginia. (R. 65-1, at ¶ 9). Counsel states his investigative file contains a sub-file entitled "Blakney interview" and contains notes counsel took based on information he obtained from either a statement Mr. Blakney made in the course of the institution's investigation or from conversations with Williams and other inmates. (*Id*. at ¶ 3). Counsel explains he did not seek leave to travel to USP Hazelton to interview Blakney because at that point in the investigation, counsel and Defendant had reviewed the surveillance video several times, reviewed statements of other inmates and determined the goal was to obtain a plea agreement whereby Williams would plead guilty to manslaughter and the charges against his co-Defendant would be dismissed. (*Id*.).

Counsel further explains that his investigation revealed Blakney came out of the cell prior to Williams entering the cell. (*Id*. at ¶ 7). Thus, counsel did not believe Blakney could testify to the events occurring in the cell after Williams entered. (*Id*. at ¶¶ 6-7). In addition, counsel explains his belief that Mr. Blakney's testimony would have been cumulative of information already known and would not have changed the result of the case. Instead, counsel explains that Williams decided to plead guilty to the manslaughter charge based on the information obtained from the investigation and because the Government agreed to dismiss the charges against his co-Defendant, who was Williams's close friend. (*Id*.).

10

In his Reply, Williams attempts to add meat to the skeleton of Blakney's Affidavit. (R. 69). Williams contends that Blakney "could've testified to the fact Defendant and co-Defendant were being bullied prior to this by the likes of Kittle." (*Id*. at 3). As discussed more thoroughly below in Section A.3., however, counsel was aware from interviewing other inmates that Kittle had an aggressive reputation. The discussion during sentencing also demonstrates that counsel was aware from the surveillance video that Kittle was being aggressive toward co-Defendant Hopkins prior to the fight, and this point does not appear to be contested. (R. 64, at 5-6, 10-12). Thus, Williams has not demonstrated that interviewing Blakney to further confirm Kittle was acting aggressively was necessary given the information already available to counsel.

Williams also argues in his Reply that Blakney "was [] evidence that Kittle had a homemade shank in the fight" (*see* R. 69, at 7), which he claims would have supported a claim of self defense. Williams's Affidavit provides Blakney "can vouch[] to the fact Kittle had a homemade shank and Defendant did not." (R. 69-11, at 2). Blakney's Affidavit, however, does not substantiate that he would have testified Kittle had a shank during the fight. *See cf. United States v. Slater*, No. 05-38-JBC-HAI, 2011 7168921, at *11 (E.D. Ky. Dec. 5, 2011), *adopted by* 2012 WL 404926 (E.D. Ky. Feb. 7, 2012) ("evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on [sic] affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim" ) (quoting *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also United States v. Hassan*, Nos. 12-cr-20523, 14-cv-11592, 2014 WL 5361942, at *5 (E.D. Mich. Oct. 21, 2014) ("[A] *Strickland* claim based on counsel's failure to investigate a potential witness requires a specific, affirmative showing of what the missing witness's testimony would be, and this

11

typically requires an affidavit from the overlooked witness.") (quoting *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012)).  In fact, Blakney's Affidavit fails to provide any information of what counsel would have learned had he interviewed him.  (R. 61).  Further, while Williams tries to overcome this deficiency, Williams does not specifically contend that Blakney was in the cell when the shank was produced, and even Williams's new account suggests otherwise.[3]

Notably, Williams does not contend that he ever told counsel it was Kittle who produced the shank used in the fight.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.  Williams has not asserted any reason why it would have been unreasonable for counsel to believe that Blakney's version of events would be consistent with that provided by Williams and his co-Defendant.

The only evidence presented as to what Blakney would have told counsel had he been interviewed is Williams's own self-serving Affidavit, submitted with his Reply, that sets forth a new version of what happened during the altercation with Kittle, which is inconsistent with the factual averments contained in the Plea Agreement.  (*Compare* R. 33, at ¶ 3, *with* R. 69-1, at 1-2).  In his Affidavit, Williams states in part:

> Inmate Kittle possessed a knife upon Defendant entering the room.  Defendant in the defense of another tried to defuse the situation [and] an already hostile Kittle striked [sic] Defendant in his right hand between the thumb and forefinger.  Upon that Defendant apprehended the knife, in which Kittle originally had, Kittle became belligerent choking, punching Defendant.  Defendant who thought himself to be in imminent danger by the likes of Kittle and on the brink of going unconscious from the devastating blow[s that] were being thrown and the firm choke hold[,] Defendant

---

[3]In his Reply, Williams explains that "Kittle started pushing Hopkins around and that Defendant entered the cell to help Hopkins defend himself.  During the course of that effort, Kittle produced a shank." (R. 69, at 3).  Williams admitted in his Plea Agreement that Blakney left the cell before Williams entered and counsel's statements to the Court of the events depicted on the jail surveillance video support this contention.  (*See* R. 33, at ¶ 3; R. 64, at 11-12).  Thus, even under Williams's new version of the facts, Blakney would not have been in the cell when Williams contends Kittle produced the shank.

striked [sic] Kittle repeatedly in self defense.  Defendant tried to withdraw from the
altercation.  Defendant even tried to communicate with Kittle asking Kittle to let him
go.  Kittle would not let Defendant out [of] his grasp.  Kittle['s] only concern was to
get his weapon back to finish what he started, and that is to stab and kill Defendant
and or possibl[y] rape Defendant.

. . .

Kamau Blakney a witness of the confrontation . . . who can vouch[] to the fact Kittle
had a home made [sic] shank and Defendant did not.  Witness can vouch to the fact
Kittle had a reputation around Big Sandy prison for being a bully and a rapist.

(R. 69-1).  This factual account, however, materially contradicts Williams's statements, under oath,

to the presiding District Judge during his rearraignment.

During the rearraignment, the presiding District Judge asked Williams to explain in his own

words what he did to be guilty of Count 2, voluntary manslaughter, and Williams stated "I got into

a fight with a guy, I had a knife on me, and I killed him."  (R. 60, at 31).  The Court inquired further:

COURT:        You said you had a knife on you.  Was it something that you made,
              that you had in your possession?

WILLIAMS:     Yes, sir.

COURT:        And the fight happened - - you didn't plan the fight, but you were in
              this fight with this other person.  Was it Mr. Kittle that's identified in
              Count 2?

WILLIAMS:     Yes, sir.

COURT:        And during the course of that fight, you did - - you did stab him.  Did
              you stab him in the neck?

WILLIAMS:     Stabbed him in the neck.

(*Id.* at 32).

Williams also confirmed that the factual basis set forth in paragraph 3 of the Plea Agreement was true and correct. (*Id*. at 33). Of note, paragraph 3 of the Plea Agreement, set forth in full above, states in part:

> Kittle demanded that Hopkins stop playing cards and come to his cell. Hopkins refused. Blakney interceded in the dispute between Hopkins and Kittle and all three went up to and entered Kittle's cell to discuss the dispute. Defendant followed the three up the stairs, but stood outside Kittle's cell and watched through the cell door. **Blakney left the cell as Kittle began fighting with Hopkins**. **Defendant entered the cell** to join in the defense of Hopkins, who is considerably smaller in stature than Kittle. **As the fight progressed, Defendant produced a homemade shank and began stabbing Kittle repeatedly**. During the heat of the battle, Defendant stabbed Kittle in the neck with the shank, which ruptured his carotid artery. . . .
>
> . . . [A] medical evaluation after the fight found that **Defendant** and Hopkins sustained no significant injuries from the fight and **had not one stab or puncture wound**.

(R. 33, at ¶ 3(b) (emphasis added)). Williams also told the Court that he was pleading guilty to Count 2, voluntary manslaughter, because he was, in fact, guilty of that charge. (R. 60, at 33). Despite the presiding District Judge's specific questions regarding the facts, Williams did not tell the Court that he took the shank from Kittle. Instead, Williams unambiguously told the Court, under oath, that the shank was something he made and had in his possession. At the conclusion of the rearraignment hearing, the District Judge asked Williams whether there were any other issues he wanted to bring up with the Court, to which Williams responded "[n]o sir." (*Id*. at 40).

It is well established that "[s]olemn declarations in open court carry a strong presumption of verity[, and the] subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the records are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see also United States v. Rennick,* 219 F. App'x 486, 489 (6th Cir. 2007) (rejecting claim of actual innocence where defendant admitted during plea to government's factual statement, which "carries a strong presumption of truthfulness")*;*

*Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999) (explaining that failing to hold defendants to their statements would "render[ ] the plea colloquy meaningless"). "[W]here the court has scrupulously followed the required [plea] procedure, 'the defendant is bound by his statements in response to that court's inquiry.'" *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (citations omitted). Given Williams's prior sworn statements during the plea colloquy,[4] his current contentions in the face of the record are wholly incredible.

Given the record before the Court, Williams has not demonstrated counsel's failure to interview Blakney was unreasonable considering all of the circumstances and applying the heavy measure of deference afforded to counsel's judgments. *Strickland*, 466 U.S. at 691. Williams does not claim to have told counsel that the shank belonged to Kittle and that Kittle produced it during the fight. Williams points to no evidence from which counsel should have reasonably concluded that further investigation was necessary on this issue. Instead, counsel's Affidavit demonstrates he investigated the facts of the case by talking with his client, Williams's co-Defendant and his counsel, reviewing the surveillance video, and interviewing other inmates. (R. 65-1, at ¶¶ 6-10). After this investigation, counsel made an informed strategic decision not to interview Blakney, who had been transferred to West Virginia, because his testimony was expected to be cumulative of information

---

[4]As discussed above, the Court meticulously complied with Rule 11 to confirm the voluntary and knowing nature of Williams's guilty plea. (R. 60, at 4-34). Williams confirmed he had read the Indictment and had sufficient time to discuss the case with his attorney. He also confirmed he had read, understood and discussed with his counsel the Plea Agreement. The Court verified no one had made Williams any promises that were not reflected in the Plea Agreement. Nor had anyone made any threats or in any way forced him to enter a guilty plea. Williams stated he was satisfied with counsel's advice and representation of him. The Court verified Williams understood the nature of the charge, the elements of the offense, the maximum penalty that could be imposed and the constitutional rights he was giving up by entering a guilty plea. Williams provided a sufficient factual basis for the elements of the offense, he confirmed the truthfulness of the stipulation of facts contained in his Plea Agreement, and he stated he was pleading guilty because he was, in fact, guilty of the charge of manslaughter. (*Id*. at 32-33). The Court found Williams's plea was knowing and voluntary.

already known and, at that point in the investigation, Williams had decided to plead guilty to manslaughter. (*Id.* at ¶¶ 6, 9-12). Accordingly, Williams has not demonstrated counsel failed to exercise reasonable professional judgment in determining further investigation was not necessary under the circumstances of the case.

Moreover, while Williams argues counsel's statement that Blakney refused to help "altered his thinking" in deciding whether to enter a guilty plea or go to trial, he has not demonstrated how Blakney's statement would have changed his decision to plead guilty. *Hill*, 474 U.S. at 370; *Strickland,* 466 U.S. at 694. Blakney was not present in the cell at the time Williams entered. Thus, there is no basis for finding that Blakney could offer testimony as to what occurred in the cell after he left and Williams entered. Williams and Hopkins, however, were present in the cell and could have offered testimony as to what transpired after Williams entered. Yet, despite knowing that his co-Defendant was a witness to the events and could offer testimony as to what occurred in the cell, Williams decided to plead guilty.

Williams has not met his burden of demonstrating counsel performed in a constitutionally deficient manner in failing to personally interview Blakney in light of the other evidence available, Defendant's decision to enter a guilty plea, and counsel's belief that Blakney's knowledge was cumulative to information already known to him. Further, Williams has not demonstrated a reasonable probability that but for counsel's alleged deficiencies he would not have pleaded guilty and would have insisted on going to trial. The Court will therefore recommend Williams's claim of ineffective assistance of counsel in this regard be denied.

        **2.**      **Williams has not demonstrated that counsel provided ineffective assistance in failing to seek a Rule 11(c)(1)(C) plea agreement.**

Williams argues that counsel provided ineffective assistance in not seeking a binding plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  (R. 46, at 6).  In *Hill*, the Supreme Court held the two-part *Strickland* test applies to challenges that a defendant's guilty plea was based on ineffective assistance of counsel.  474 U.S. at 58-59.  As explained below, however, Williams has not met his burden of demonstrating that counsel failed to act within the wide range of reasonable professional assistance required of counsel during plea negotiations.  *Strickland*, 466 U.S. at 694.  Instead, Williams offers only unsupported and conclusory arguments that counsel could have negotiated a binding sentence that was more favorable to Williams than the sentence he received.

In his Motion, Williams contends that he asked counsel "for an 11(c)(1)(C) cap and asked that it be capped [] at 8 years."[5]  (R. 46, at 6).  Williams argues that counsel responded to his request by stating that the Judge would not accept a plea with a cap and it would be frivolous to present such an agreement.  (*Id*.).  Williams has not offered any basis for his contention that his attorney could have successfully negotiated with the Government for a binding plea agreement setting his sentence at eight years.  In fact, the Government explained in its Response that if counsel had asked for a binding plea capping Williams's sentence at eight years, it would have rejected the request because such a sentence was significantly below the Sentencing Guidelines range.  (R. 65, at 9).  *See United States v. Smith*, No. 3:10-cr-199, 2015 WL 7313389, at *4 (E.D. Va. Nov. 19, 2015) (finding counsel

---

[5]Williams's statement also makes a vague reference to "being forced to plea."  (R. 46, at 6). To the extent this statement was intended as an argument that Williams was forced to enter his guilty plea, he stated otherwise during the plea colloquy.  Specifically, the presiding District Judge asked Williams whether "anyone made any threats or in any way forced [him] to sign the[] documents or to enter a guilty plea, to which Williams responded, under oath, "[n]o, sir."  (R. 60, at 18).

did not render ineffective assistance in failing to seek a Rule 11(c)(1)(C) agreement that was not viable).

In his Reply, Williams changes his argument and states counsel should have explained to him that although he could not get a binding sentence of eight years, "Defendant could get counsel to negotiate with [the] prosecution [for] an 11(c)(1)(C) [binding sentence of] 120 months at least."[6] (R. 69, at 8). Again, however, Williams cannot demonstrate deficient performance in counsel's failure to request a binding Rule 11(c)(1)(C) agreement for a 120-month sentence because he has not presented any evidence that the Government was willing to enter into a Rule 11(c)(1)(C) agreement that provided for a lesser sentence than that which was imposed.

In addition, the record demonstrates that counsel's strategy was to argue for a downward departure from the Sentencing Guidelines range based on the victim's role in provoking the offensive conduct. As discussed in Section A.3. below, counsel was successful in obtaining a one-level reduction in Williams's offense level on this basis, which reduced his Sentencing Guidelines range from 120 to 150 months to 110 to 137 months. (R. 64, at 14-17). Williams has not demonstrated counsel's strategy in this regard was unreasonable. Thus, Williams's vague arguments that counsel was deficient in not seeking a Rule 11(c)(1)(C) agreement are not supported by any evidence and do not demonstrate deficient performance.

Further, Williams has failed to satisfy the prejudice prong of *Strickland* because he has not established a reasonable probability that his sentence would have been different had counsel

---

[6]In conjunction with his argument in reply that his counsel was ineffective for failing to seek a Rule 11(c)(1)(C) agreement, Williams also implies counsel should have informed him of the availability of an *Alford* plea. (R. 68, at 8). However, Williams again has pointed to no evidence that the Government or the presiding District Judge would have accepted an *Alford* plea or that such a plea would have resulted in a different sentence. Thus, Williams has not demonstrated that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

requested the Government enter into a Rule 11(c)(1)(C) agreement.  "[A] C-type plea agreement does not simply spring into existence based on an attorney's sheer willpower.  Instead, not only must the Government sign onto the agreement, but the district court must also 'acquiesce[ ] . . . to be bound by its stipulations.'"  *Gonzalez-Carrion v. United States*, No. 2:15-cv-1907, 2016 WL 297433, at *3 (D.P.R. Jan. 22, 2016) (citation omitted).  Williams has not presented any argument, let alone evidence, suggesting that had counsel requested a Rule 11(c)(1)(C) agreement, the Government would have entered into such an agreement and the presiding District Judge would have accepted it.  *See United States v. Richardson*, No. 05-105, 2013 WL 1442483, at *4 (S.D. Ala. Apr. 9, 2013) (court, citing *Strickland*, 466 U.S. at 694, rejected claim that defendant was prejudiced by counsel's failure to negotiate a binding plea agreement under Rule 11(c)(1)(C) because no basis for contention attorney could have negotiated a more favorable plea agreement or that it was reasonably probable that sentence would have been different had counsel taken the action suggested).  Thus, Williams has failed to demonstrate a reasonable probability that his sentence would have been different had counsel sought a Rule 11(c)(1)(C) plea agreement.  Accordingly, Williams's claim of ineffective assistance of counsel in this regard fails.

> **3.    Williams has not demonstrated counsel provided ineffective assistance in failing to present evidence at sentencing to support his argument for a downward departure based on the victim's role in the offense**.

Williams argues counsel provided ineffective assistance by failing to present evidence to support his arguments at sentencing for a downward departure based on the victim's role in the offense. (R. 46, at 8).  Specifically, Williams contends that while the Court granted him a one-level reduction in his offense level because of the victim's role, the Court would have given him a two-level reduction had counsel presented available evidence.  (R. 69, at 8-9).

Under § 5K2.10 of the Sentencing Guidelines, a district court may reduce a sentence below the Sentencing Guidelines range where the court finds "the victim's wrongful conduct contributed significantly to provoking the offense behavior." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 5K2.10 (2014). Section 5K2.10 sets forth six factors a court should consider in determining the applicability and extent of a sentence reduction based on the victim's conduct in the matter: 1) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant; 2) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation; 3) the danger reasonably perceived by the defendant, including the victim's reputation for violence; 4) the danger actually presented to the defendant by the victim; 5) any other relevant conduct by the victim that substantially contributed to the danger presented; 6) the proportionality and reasonableness of the defendant's response to the victim's provocation. *Id*.

Here, Williams admits his counsel made an argument at sentencing for a downward departure based on the victim's role in the offense, but contends that had counsel supported his argument with evidence, the Court would have granted him a greater reduction. (R. 46, at 8; R. 69, at 8-9). Williams does not point to any specific evidence he contends counsel should have presented to the Court. Instead, Williams argues generally that counsel had evidence available to him, via testimony of inmate witnesses, testimony from Williams, as well as Kittle's "file" that would have supported his arguments of the relevant factors. (R. 69, at 9). Williams points to his counsel's negative response to the Court's inquiry at sentencing as to whether counsel had any supporting evidence to present as the reason the Court granted a one-level reduction in his offense level instead of a two-level reduction. Review of the record as a whole, however, demonstrates that the presiding District Judge gave Williams the benefit of counsel's proffer in considering the relevant § 5K2.10 factors.

The record demonstrates that after the preparation of the PSR, counsel filed a Sentencing Memorandum, arguing that a departure below the recommended Sentencing Guidelines range of 120 to 150 months was appropriate under § 5K2.10 of the Sentencing Guidelines, and he set forth argument with respect to the relevant factors. (R. 30). At sentencing, the Court heard argument from defense counsel and the AUSA regarding their positions on the applicability of § 5K2.10 to Williams's circumstances. (R. 64, at 4-13). After hearing argument of both counsel, the Court held the victim's conduct did contribute significantly to provoking Williams's offense behavior. (*Id*. at 15). The Court considered the relevant factors under § 5K2.10 and granted the request for a downward departure, but found a one-level reduction was appropriate.[7] (*Id*. at 17).

Review of the Court's analysis of the relevant § 5K2.10 factors demonstrates that counsel's decision to present his argument by way of proffer instead of presenting evidence did not affect the Court's decision to grant a one-level reduction in the offense level. In determining the appropriate reduction for the victim's conduct, the Court analyzed the relevant § 5K2.10 factors. (R. 64, at 15-16). First, with respect to the size, strength, and physical characteristics of the victim in comparison to the defendant, the Court considered these attributes not only in comparison to Williams, but also to his much smaller co-Defendant, which then favored a reduction. (R. 64, at 16). Second, the Court noted that the factor concerning the persistence of the victim's conduct and efforts by the defendant to prevent the confrontation did not apply to Williams's circumstance because Kittle's instigating conduct was directed to Williams's co-Defendant and Williams intervened after the confrontation began.

---

[7]The presiding District Judge explained he could consider the issue of the victim's role in the offense as either a departure under § 5K2.10 of the Sentencing Guidelines or under the 18 U.S.C. § 3553 sentencing factors. (R. 64, at 14). The Judge determined it was appropriate to consider the issue under § 5K2.10, but noted he would reach the same sentence under either calculation. (*Id*. at 27-29).

Third, the Court considered the danger reasonably perceived by Williams, including consideration of Kittle's reputation for violence. (*Id*.). The Judge explained that while he did not have the records from the Bureau of Prisons regarding Kittle's history of infractions, based on counsel's presentations and apparent agreement, there was a basis for Williams to reasonably fear that Kittle was presenting a threat. (*Id*. at 15-16). The Judge specifically noted that, based on counsel's statements, there was a reasonable fear of Kittle possessing a shank or some other dangerous weapon.[8] (*Id*.). Fourth, the Court concluded that the danger Kittle actually presented to Williams did not weigh in Williams's favor because Williams interceded in the altercation. (*Id.* at 16). Fifth, the Court considered Kittle's other relevant conduct that may have contributed to the danger. Lastly, the Court considered the proportionality and reasonableness of Williams's response to Kittle's conduct, and found Williams's conduct was not proportional to the threat presented at the time. (*Id*. at 17). Given these findings, the Court granted a one-level reduction in the offense level.

The District Judge's specific findings on the § 5K2.10 factors demonstrate it is not reasonably probable that the Court would have granted a two-level reduction had counsel's proffer been supported by evidence. While Williams asserts counsel should have presented "Kittle's file," he does not identify any specific evidence from that file that supports a reasonable probability the Judge would have granted a greater departure had he been presented the evidence. To the contrary, the record demonstrates that despite not having records from the Bureau of Prisons about Kittle's

---

[8]The Court asked both counsel whether they had documentation of Kittle's history of infractions at the institution, and while neither counsel had documentation to present to the Court, they agreed the investigation established Kittle had a reputation within the prison for violence. (R. 64, at 4-13). In fact, despite the Government's argument against a § 5K2.10 departure, when the Court asked AUSA Dicken if he knew whether Kittle had ever been written up for possessing prohibited objects, AUSA Dicken responded that he did not know, but would not be surprised. (*Id*. at 12-13). In addition, defense counsel explained to the Court that his interview of other inmates demonstrated that Kittle had "quite the reputation for violence." (*Id*. at 9).

22

history of infractions, the Judge accepted counsel's representations regarding Kittle's reputation for violence. (*Id.* at 15-17). Williams does not point to any additional fact that he contends counsel should have presented in support of his arguments for a downward departure. Nor does Williams identify any other specific evidence that counsel should have presented and did not. The record demonstrates the Court was well informed of the relevant facts and after careful consideration of the arguments of counsel and considering the relevant factors, the Court determined a one-level reduction was merited. Williams has not established the result of his sentencing would have been different had his counsel presented evidence supporting his argument for a downward departure on the basis of the victim's wrongful conduct. *See Strickland*, 466 U.S. at 697. Accordingly, this claim of ineffective assistance fails as Williams has failed to establish prejudice.

### 4. Williams has not demonstrated counsel provided ineffective assistance in failing to argue Williams had a diminished mental capacity.

Williams argues in his Motion that counsel rendered ineffective assistance in failing to argue "mental diminished capacity in regards to [his] mental health history." (R. 46, at 13). In support, Williams asserts that since he was a juvenile, he has a history of being mentally impaired. He asserts he suffers from attention deficit hyperactivity disorder ("ADHD"), stress, depression and also claims he has been diagnosed with bipolar disorder. (*Id.*). Williams further argues that he has not taken his medication for "quite some time" and asserts this could have "affected [his] wayward misfortune." (*Id.*).

To the extent Williams's claim can be read as asserting that counsel was deficient in not arguing his mental health history to the Court as a mitigating circumstance for the Court's consideration in reviewing the sentencing factors under 18 U.S.C. § 3553, even assuming counsel was deficient in this regard, Williams cannot establish prejudice. As discussed below, the presiding

District Judge conducted a thorough plea colloquy that specifically addressed Williams's mental health history.  (R. 60, at 5-13).

Specifically, during the plea colloquy the presiding District Judge asked Williams questions to confirm he was competent to enter a guilty plea.  Williams denied receiving any current treatment for any mental health issues.  (R. 60, at 6).  Williams told the Court he had been treated in the past for ADHD, bipolar disorder, social anxiety, and depression.  He explained he began taking Ritalin in grade school and then started taking Seroquel at about the age of 15.  (*Id*. at 6-7).  However, Williams, on his own initiative, stopped taking his medications and has not taken any mental health medication for several years and does not take any other medications.  (*Id.*).  When asked when he last received mental health treatment, Williams stated he "sat down" with a psychiatrist at USP Big Sandy in 2013.  Thus, the Court was aware of Williams's mental health history when it considered the § 3553 factors, and Williams suffered no prejudice by counsel's failure to argue this point.  (R. 60, at 5-13).

Further, to the extent Williams is arguing that counsel should have sought a downward departure on the basis of diminished capacity under § 5K2.13, he has not pointed to any evidence that he met the requirements for its application.  This policy statement permits a downward departure if the defendant committed an offense while suffering from a significantly reduced mental capacity, and the reduced mental capacity contributed substantially to the commission of the offense. U.S.S.G. § 5K2.13.  Application Note 1 to the policy statement provides that for purposes of § 5K2.13, "significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is

wrongful." U.S.S.G. § 5K2.13. Williams has not presented any evidence that he suffered from a "significantly reduced mental capacity," as that term is defined in the application note, at the time of the offense conduct. Nor is there any indication that he raised the issue of his alleged mental deficiency with the probation officers who prepared the PSRs on either the current matter or on the matter before the District of Columbia for which he was serving time at USP Big Sandy when this offense occurred. In fact, review of the PSR prepared in 2013 for the court in the District of Columbia reveals that Williams denied ever receiving mental health treatment or services.

Another point needs mention. In his Reply, Williams raised an additional fact not raised in his Motion, stating that he asked counsel for a mental evaluation because he suffers from symptoms similar to battered woman syndrome and post traumatic stress disorder. Williams implies Kittle's history of abusive conduct toward him was the source of his mental distress. Again, however, Williams has presented no evidence to support his claim. Other than Williams's own subjective opinion, there is nothing in the record to suggest that he did not understand the wrongfulness of his offense conduct, lacked the power to reason or otherwise suffered from a significantly reduced mental capacity at the time of the offense. Thus, even assuming counsel was deficient for failing to request a mental examination, Williams has not presented any evidence demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

    **B.**     **Non-Ineffective Assistance of Counsel Claims**

        **1.**     **Williams was not denied due process by his pretrial detention in a facility that did not have a legal library.**

In his second ground for relief, Williams argues he was denied due process and his right to access to the courts because he was housed pretrial in a county jail that did not have a law library.[9] (R. 46, at 5; R. 69, at 7). The Government responds that Williams's claim fails because he was represented by counsel, which satisfies a defendant's right of access to the courts. (R. 65, at 8 (citing *Smith v. Harvey Cty. Jail*, 889 F. Supp. 426, 431-32 (D. Kan. 1995) (an inmate's right of access to the court is adequately protected where the inmate is represented by counsel, even if the inmate is not allowed access to legal materials to personally conduct legal research.")). Upon consideration, Williams has failed to demonstrate a violation of his fundamental rights in this regard. As another district court has explained:

> "It is now clearly established that prisoners have a constitutional right of access to the courts." *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (citing *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494, 52 L. Ed.2d 72 (1977)). In *Bounds v. Smith*, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S. Ct. at 1498. However, a criminal defendant has no right to access to a law library to aid him in his own defense at trial when he has been provided legal counsel. *See Edwards v. United States*, 795 F.2d 958, 961 nn.1, 3 (11th Cir. 1986) (rejecting habeas petitioner's claim he was denied access to a law library during criminal trial where he had counsel available to assist him). *See also Wilson v. Blankenship*, 163 F .3d 1284, 1291 (11th Cir. 1998) (pretrial detainee's lack of access to law library resulted in no actual legal injury regarding his criminal conviction because he was represented by counsel in that matter).

---

[9]To the extent Williams's vague statement that "he raised this issue with counsel" can be read as asserting a claim of ineffective assistance of counsel, it fails under both prongs of *Strickland*. As discussed below, Williams was represented by counsel, and therefore he had no right of access to a law library. Thus, to the extent Williams is claiming counsel should have raised the issue with the Court, counsel cannot be found to be constitutionally ineffective for failing to raise meritless arguments. *See Chapman v. United States*, 74 F. App'x 590, 593 (6th Cir. 2003) ("Counsel is not required by the Constitution to raise frivolous defenses or arguments to avoid a charge of ineffective representation"). Moreover, Williams has not demonstrated that but for counsel's alleged deficient conduct the outcome of the proceedings would have been different. Thus, neither prong of *Strickland* having been demonstrated, any ineffective assistance of counsel claim in this regard fails.

26

*Kallon v. United States*, No, 2:2012-cv-8029, 2013 WL 6240441, at *12 (N.D. Ala. Dec. 3, 2013) (rejecting claim in § 2255 motion that lack of access to law library during pretrial detention resulted in constitutional deprivation where defendant was represented by counsel); *see cf. Bourdon v. Loughren,* 386 F.3d 88, 94 (2d Cir. 2004) (holding that "the appointment of counsel can be a valid means of fully satisfying a state's constitutional obligation to provide prisoners, including pretrial detainees, with access to the courts"); *United States v. Smith,* 907 F.2d 42, 45 (6th Cir. 1990) (holding that "the state does not have to provide access to a law library to defendants in criminal trials who wish to represent themselves" and waive their right to counsel).

Here, as the Government notes, the Court appointed counsel to represent Williams at his initial appearance and arraignment on August 22, 2014. (R. 9). Counsel thereafter was available to consult with Williams on all matters involving his case. Williams has not pointed to any evidence to suggest his access to counsel was impeded. (R. 65). While Williams argues in his Reply that he knew counsel was violating his right to effective assistance of counsel and would have fired counsel had he known he could do so, the record belies this argument. (R. 60, at 13-14).

Specifically, during his rearraignment, the Court engaged Williams in the following colloquy:

COURT:       Mr. Williams, Ms. Swiney is sitting in today for Mr. Stephens who's ill. I know Mr. Stephens was appointed to represent you originally, and he's had conversations and has spoken to you on several occasions. Is that correct?

WILLIAMS:   Yes.

COURT:       Do you have any objection to Ms. Swiney appearing here today and sitting in for Mr. Stephens?

WILLIAMS:   No, sir.

COURT:       Have you had enough time to talk with her about the case?

WILLIAMS:  Yes, sir.

. . .

COURT       Have you had the opportunity to review the indictment and also to discuss it with your attorneys?

WILLIAMS:  Yes.

COURT:      Have you discussed not only the charges against you but the case in general with your counsel?

WILLIAMS:  Yes.

COURT:      Are you satisfied with the advice and representation that your attorneys have given you to this point in the case?

WILLIAMS:  Yes.

(R. 60, at 13-15).

The Court also confirmed Williams had reviewed the Plea Agreement with his counsel, understood its terms and conditions, and understood the potential sentence he faced, and the rights he was waiving by pleading guilty. Thus, the record demonstrates the Court carefully questioned Williams to verify he had sufficient time to confer with counsel regarding his case, and he was satisfied with his counsel's advice and representation. (*Id*.). Because "[s]olemn declarations in open court carry a strong presumption of verity," *Blackledge*, 431 U.S. at 74, a defendant is bound by his statements where the court has followed the required procedure under Rule 11. *Baker*, 781 F.2d at 90. Williams's unsupported allegations that he was denied access to the courts are insufficient to overcome the presumption of verity ascribed to the sworn statements he made before the presiding District Judge. Accordingly, Williams has not demonstrated a due process violation for the denial of his right of access to the courts based upon the unavailability of a law library during his pretrial detention because he was represented by counsel during this time period.

28

Lastly, as the Government also mentions, Williams's knowing and voluntary guilty plea bars his assertion of constitutional violations occurring prior to entry of his plea. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). As discussed above, Williams has failed to establish his ineffective assistance of counsel claims, and the Court's thorough plea colloquy established that Williams's plea was knowing and voluntary. Thus, his claims of constitutional violations occurring prior to his plea fail.

### 2. Williams's attempt to raise new contentions in reply fail.

Lastly, to the extent Williams's Reply can be read as asserting that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a picture of the shank or Kittle's "file," his failure to raise any form of this argument in his initial Motion waives the claim.[10]  *See Sanborn v. Parker,* 629 F.3d 554, 579 (6th Cir. 2010) (citing *Am. Trim, L.L.C. v. Oracle Corp.,* 383 F.3d 462, 477 (6th Cir. 2004)); *see also United States v. McCorkle,* No. 1:07-cr-288, 2010 WL 2131907, at *7 (W.D. Mich. Mar. 30, 2010)(collecting cases); *Burns v. Lafler,* 328 F. Supp. 2d 711, 724 (E.D. Mich. 2004). It will therefore be recommended that to the extent Williams attempts to raise  a *Brady* claim

---

[10]Williams also makes various statements in reply to the effect that the Government's theory of what occurred was not accurate, but contrived misrepresentations. (R. 69, at 5). Regardless of the Government's view of the evidence, Williams admitted to the District Judge, under oath, the factual basis supporting his guilty plea, and he has not presented sufficient evidence to overcome the truth attributed to those sworn statements. *Blackledge*, 431 U.S. at 74. Further, Williams's unsupported statement that the Government presented "testimony known to be a pretext theory with no factual supporting evidence," is not supported by any meaningful argument or discussion of facts. (R. 69, at 5). Accordingly, the Court should not consider it further. *See United States v. Whitson*, 6:12-67-DCR, 2015 WL 520531, at *4 (E.D. Ky. Feb. 9, 2015) (dismissing arguments that were conclusory and did not delineate any facts that would allow a finding that defendant's claims were supported by preponderance of evidence) (citations omitted).

in his Reply, the claim be denied as procedurally improper.  In addition, Williams's effort to present a *Brady* claim fails on the merits and thus, the Court will also recommend dismissal for that reason.

Looking at the merits, it is well established that to succeed on a *Brady* claim, "a habeas Petitioner must show that (1) the withheld evidence was favorable to the Petitioner, (2) the evidence was suppressed by the government, and (3) the Petitioner suffered prejudice." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008).  Looking first to Williams's claim that the Government suppressed the picture of the shank, Williams provides no basis for finding this evidence was favorable to him.  Nor does Williams articulate any argument as to how he suffered prejudice.  Instead, Williams simply states that because he did not receive a picture of the shank in response to his motion for discovery, a *Brady* violation occurred.  As discussed, more is required to prove a violation, and Williams's conclusory argument fails to meet his burden.  *See United States v. Roach*, 502 F.3d 425, 442 (6th Cir. 2007) (deeming undeveloped claims unreviewable) (citing *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")).

Similarly, Williams's statement that the prosecution failed to disclose the victim's "file" fails.[11]  First, the Court notes Williams's Reply is internally inconsistent in this regard.  In setting forth the facts, Williams asserts the Government withheld the victim's file, but in making his argument of ineffective assistance of counsel for failure to produce evidence in support of a § 5K2.10 departure, Williams argued counsel was in possession of this evidence and failed to bring it to court.  (*Compare* R. 69, at 5, *with* R. 69, at 9).

---

[11]Williams does not identify the "file" he is referencing.  Based on the arguments made, the Court presumes he is referencing a file maintained by the Bureau of Prisons on Kittle's conduct while housed in its facilities.

Further, Williams has not provided any evidence that a "file" on Kittle existed, or that such a file, if it did exist, would have been favorable to Williams's defense. While Williams speculates the "file" would have contained Kittle's characteristics and criminal history, which would have supported a self-defense or justifiable homicide defense, Williams's failure to provide any substance to his argument requires the Court to speculate as to what evidence he claims was suppressed. To the extent he sought evidence of Kittle's aggressive behavior and physical characteristics, the record demonstrates this information was already known to the Defendant and his counsel by way of inmate interviews and Williams's personal knowledge. (R. 64, at 5-10). Thus, as the record exists, there is no evidence that the Government withheld exculpatory evidence that was not already known to Williams and his counsel or not available from another source. *See Carter v. Bell*, 218 F.3d 581, 601-03 (6th Cir. 2000) ("Where a defendant knew or should have known the essential facts permitting him to take advantage of potentially useful information, the prosecution's failure to disclose such information does not violate *Brady*.). Accordingly, Williams has not demonstrated a *Brady* violation occurred with respect to Kittle's "file."

Moreover, as discussed above, Williams's knowing and voluntary guilty plea bars his assertion of constitutional violations occurring prior to entry of his plea. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Accordingly, any claim of a *Brady* violation arguably raised in his Reply is barred by his guilty plea.

## III.   CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Federal Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if a defendant has made a substantial showing of the denial of a

31

constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (addressing issuance of a certificate of appealability in the context of a habeas petition filed under 28 U.S.C. § 2254, which legal reasoning applies with equal force to motions to vacate brought under § 2255.  In cases where a district court has rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*.  "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists would not debate the denial of Defendant's § 2255 Motion or conclude that the issues presented are adequate to deserve encouragement to proceed further. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Accordingly, it will further be herein **recommended** that a certificate of appealability be **denied** upon the District Court's entry of its final order in this matter.

## IV.    CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that:

(1)    Defendant Eric Williams's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence (R. 46) be **denied**;

(2)      a Certificate of Appealability be **denied** by the District Judge in conjunction with the Court's entry of its final order in this matter;

(3)      Judgment in favor of the United States be entered contemporaneously with the District Court's entry of its final order; and,

(4)      this action be stricken from the active docket of this Court.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute. *See also* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 8(b). Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Walters,* 638 F.2d 947, 950 (6th Cir. 1981).

Dated this 16th day of November, 2016.



**Signed By:**

*Candace J. Smith*

**United States Magistrate Judge**

J:\DATA\habeas petitions\2255 R&R general\14-15-DCR Williams R&R.final.wpd